## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| STATE EMPLOYEES CREDIT UNION OF MARYLAND, INC., 971 Corporate Blvd Linthicum, MD 21090 | * * * | |
| Plaintiff, | * | |
| v. | * | **COMPLAINT AND** |
| BOCA INVESTMENTS, LLC t/a PRICELESS OF ODENTON, 1600 Annapolis Road Odenton, Maryland 21076 | * * | **PRAYER FOR JURY TRIAL** Civil Action No.: _____ |
| Serve on Resident Agent: Richard Sissman, Esquire Fracassi Mahdavi Sissman & Rand, LLP 600 Jefferson Plaza, Suite 308 Rockville, Maryland 20852 | * * * | |
| OMID ILKHAN, 1600 Annapolis Road Odenton, Maryland 21076 | * * | |
| AUTO SELECT INC. t/a ULTIMATE AUTO, 4740 St. Barnabas Road Temple Hills, Maryland 20748 | * * * | |
| Serve on Resident Agent: Richard Sissman, Esquire Fracassi Mahdavi Sissman & Rand, LLP 600 Jefferson Plaza, Suite 308 Rockville, Maryland 20852 | * * * | |
| AMIR HALATAEI, 4726-C St. Barnabas Road Temple Hills, Maryland 20748 | * * | |
| | * | |

NEA, INC.,                                             *
4726-C St. Barnabas Road
Temple Hills, Maryland 20748                           *

    Serve on Resident Agent:                       *
    Richard Sissman, Esquire
    Fracassi Mahdavi Sissman & Rand, LLP           *
    600 Jefferson Plaza, Suite 308
    Rockville, Maryland 20852                      *

MEHRAN HALATAEI,                                       *
4740 St. Barnabas Road
Temple Hills, Maryland 20748                           *

JODI COWLEY MAHDAVI,                                   *
915 Fairway Drive NE
Vienna, Virginia 22180                                 *

ANNA L. COWLEY,                                        *
915 Fairway Drive NE
Vienna, Virginia 22180                                 *

DIANA KNEIPP,                                          *
222 S. Easton Street
Baltimore, Maryland 21224                              *

MITZI COWLEY DAVIS,                                    *
1532 Dalton Place
Winchester, Virginia 22601                             *

MEHDI GOUDARZI ,                                       *
7707 Iroquois Close
Falls Church, Virginia 22043                           *

MOHAMMAD ERAM,                                         *
905 Echols Street SE
Vienna, Virginia 22180                                 *

ABDOLREZA OSSAREH,                                     *
7935 Deepwell Drive
Bethesda, Maryland 20817                               *

    Defendants.                                    *
*       *       *       *       *       *       *       *  *       *       *       *       *       *       *

## COMPLAINT AND PRAYER FOR JURY TRIAL

Plaintiff State Employees Credit Union of Maryland, Inc. ("SECU"), by and through its undersigned attorneys, brings this action pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, against defendants BOCA Investments, LLC t/a Priceless of Odenton; Auto Select Inc. t/a Ultimate Auto; NEA, Inc.; Omid Ilkhan; Amir Halataei; Mehran Halataei; Jodi Cowley Mahdavi; Anna L. Cowley; Diana Kneipp; Mitzi Cowley Davis; Mehdi Goudarzi; Mohammad Eram; and Abdolreza Ossareh.

Defendants BOCA Investments, LLC t/a Priceless of Odenton ("Priceless of Odenton"); Auto Select Inc. t/a Ultimate Auto ("Ultimate Auto"); and NEA, Inc. ("NEA") are collectively referred to herein as the "Dealer Defendants." Defendants Anna L. Cowley; Diana Kneipp; Mitzi Cowley Davis; Mehdi Goudarzi; Mohammad Eram; and Abdolreza Ossareh are collectively referred to herein as the "Borrower Defendants." All of the defendants including the Dealer Defendants and the Borrower Defendants are collectively referred to herein as the "Defendants." In support of this Complaint, Plaintiff SECU alleges and states as follows:

### INTRODUCTION

1.     Defendants have associated together and acted in concert with one another to obtain over $750,000 worth of loans from SECU under false and fraudulent pretenses.

2.     Specifically, Defendants entered into a series of sham motor vehicle purchase agreements in order to obtain financing from SECU, a "financial institution" within the meaning of 18 U.S.C.        § 1344.

3.     As part of their scheme, the Borrower Defendants applied for and received loans from SECU for the stated and sole purpose of purchasing used motor vehicles from the Dealer

3

Defendants.  The Borrower Defendants, in concert with the Dealer Defendants and Omid Ilkhan, Amir Halataei, Mehran Halataei, and Jodi Cowley Mahdavi, provided SECU with false purchase agreements reflecting the purported sale of the used motor vehicle for which financing was being sought, and/or fictitious information in the loan documents regarding the purported sale of the used motor vehicle for which the Borrower Defendants sought financing.

4.      In reliance on the bogus purchase agreements and/or fictitious information in the loan documents, SECU extended credit to the Borrower Defendants and issued loan checks.

5.      The Dealer Defendants accepted and endorsed the loan checks, received the loan proceeds, but did not sell and did not intend to sell the identified used motor vehicles to the Borrower Defendants.  Instead, the Dealer Defendants used the loan proceeds as "floor plan financing" for their own enterprise.

6.      Having fraudulently obtained this "floor plan financing" from SECU, the Dealer Defendants purchased used motor vehicles, including some of the same vehicles which they purportedly had already sold to the Borrower Defendants.

7.      Notwithstanding the fact that the vehicles purportedly had been sold to the Borrower Defendants, and despite the obligation and agreement to provide SECU with a first lien security interests in the used motor vehicles, the Dealer Defendants subsequently sold the same vehicles to unsuspecting, third-party consumers.

8.      The third-party consumers, in turn, granted security interests in their vehicles to parties other than SECU.  As a result, the loans made by SECU to the Borrower Defendants are unsecured in breach of both the Borrower Defendants' contractual obligation to grant SECU a

perfected, first lien security interest in the vehicles, and the Dealer Defendants' endorsement, representation and obligation to take all steps to perfect SECU's security interest in the vehicles.

9.      Defendants' scam, which began as early as 2014 and has continued through 2017, has caused SECU to sustain substantial monetary loss.  As a direct and proximate result of Defendants' fraud and racketeering activities, SECU has been damaged in excess of $500,000.

10.     As Defendants have knowingly executed a scheme to defraud SECU, they have committed bank fraud in violation of 18 U.S.C § 1344, a crime actionable in civil suits under the RICO, 18 U.S.C. § 1964.

**JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action involves a federal question related to RICO, 18 U.S.C. § 1964.  Specifically, this Complaint alleges violations of 18 U.S.C. § 1962, through the predicate acts of bank fraud as defined by 18 U.S.C. § 1344.  The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the RICO claims that they form part of the same case or controversy under Article III of the United States Constitution.

12.     Venue is proper in the District of Maryland under 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(2) and (3) because this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred, and because it is a judicial district in which ten of the thirteen Defendants reside and/or are regularly engaged in business and all of the Defendants are subject to this Court's personal jurisdiction.

5

## PARTIES

13.     SECU is a Maryland state-chartered, federally insured credit union with its principal office and place of business located at 971 Corporate Boulevard, Linthicum, Maryland 21090. SECU is a "financial institution" within the meaning of 18 U.S.C. § 1344.

14.     Defendant BOCA Investments, LLC is a limited liability company organized under the laws of the State of Maryland with its principal office and place of business located at 1600 Annapolis Road, Odenton, Maryland 21113. BOCA Investments, LLC conducts business under the trade name Priceless of Odenton. BOCA Investments, LLC is in the business of owning and operating the used car dealership known as Priceless of Odenton located in the State of Maryland.

15.     Defendant Auto Select Inc. is a domestic corporation organized under the laws of the State of Maryland with its principal office and place of business located at 4740 St. Barnabas Road, Temple Hills, Maryland 20748. Auto Select Inc. conducts business in its own name and under the trade name Ultimate Auto. Auto Select Inc. is in the business of owning and operating the used car dealership known as Ultimate Auto located in the State of Maryland.

16.     NEA, Inc. is a domestic corporation organized under the laws of the State of Maryland with its principal office and place of business located at 4726-C St. Barnabas Road, Temple Hills, Maryland 20748. NEA, Inc. is in the business of owning and operating a used car dealership located in the State of Maryland.

17.     Defendant Omid Ilkhan is a member, employee, and/or officer of BOCA Investments, LLC and is responsible, in part or in full, for operating the automobile dealership

known as Priceless of Odenton.  Omid Ilkhan regularly engages in business at 1600 Annapolis Road, Odenton, Maryland 21113.

18.    Defendant Amir Halataei is an officer, employee, shareholder, and/or director of Auto Select Inc. and NEA, Inc.  Amir Halataei has responsibilities for operating the automobile dealerships known as Ultimate Auto and NEA and regularly engages in business in Temple Hills, Maryland.

19.    Defendant Mehran Halataei is an officer, employee, shareholder, and/or director of Auto Select Inc. and regularly engages in business at 4740 St. Barnabas Road, Temple Hills, Maryland 20748.  Mehran Halataei is the president of Auto Select, Inc. and, as such, has responsibilities for operating the automobile dealership known as Ultimate Auto.

20.    Defendant Jodi Cowley Mahdavi is a member, employee, and/or officer of BOCA Investments LLC and is also an officer, employee, shareholder, and/or director of Auto Select Inc.  Jodi Cowley Mahdavi has responsibilities for operating the automobile dealerships known as Priceless of Odenton and Ultimate Auto and regularly engages in business at 1600 Annapolis Road, Odenton, Maryland 21113 and 4740 St. Barnabas Road, Temple Hills, Maryland 20748. Upon information and belief, Jodi Cowley Mahdavi maintains a residence at 915 Fairway Drive NE, Vienna, Virginia 22180.

21.    Upon information and belief, Defendant Anna L. Cowley works and engages in business in Baltimore, Maryland and maintains a residence at 915 Fairway Drive NE, Vienna, Virginia 22180.  Anna L. Cowley is the sister of Co-Defendant Jodi Cowley Mahdavi and also has a familial relationship with Co-Defendant Mitzi Cowley Davis.

22.     Defendant Diana Kneipp is a resident of the State of Maryland who lives at 222 S. Easton Street, Baltimore, Maryland 21224.

23.     Defendant Mitzi Cowley Davis is a resident of the Commonwealth of Virginia who lives at 1532 Dalton Place, Winchester, Virginia 22601.  Mitzi Cowley Davis has a familial relationship with Co-Defendants Jodi Cowley Mahdavi and Anna L. Cowley.

24.     Defendant Mehdi Goudarzi is a resident of the Commonwealth of Virginia who lives at 7707 Iroquois Close, Falls Church, Virginia 22043.

25.     Defendant Mohammad Eram is a resident of the Commonwealth of Virginia who lives at 905 Echols Street SE, Vienna, Virginia 22180.  Mohammad Eram was the president and majority shareholder of Co-Defendant Auto Select, Inc. until March 2011, when he was removed as shareholder and officer and replaced by Co-Defendant Mehran Halataei.  As late as December 2016, Mohammad Eram worked for and was employed by Co-Defendant Auto Select, Inc.

26.     Defendant Abdolreza Ossareh is a resident of the State of Maryland who lives at 7935 Deepwell Drive, Bethesda, Maryland 20817.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### Defendants' Scheme To Defraud SECU

27.     This is an action against the Defendants associating in fact, resulting from their conduct to defraud SECU into making loans to finance the alleged purchase of used motor vehicles which were never sold by the Dealer Defendants and never purchased by the Borrower Defendants as well as from a conspiracy among Defendants to conceal and not disclose that the transactions being financed by SECU were a sham.

28.     Generally, an automobile dealership obtains "floor plan financing" from one or more lenders.  Floor plan financing is typically a revolving line of credit that is drawn against by the dealer to purchase its inventory of automobiles and when each automobile is sold by the dealer, the dealer then repays the debt.

29.     Upon information and belief, the Dealer Defendants did not have or were unable to obtain "floor plan financing" or, alternatively, the "floor plan financing" they had was insufficient to allow them to acquire an inventory of used motor vehicles.

30.     As a result, the Dealer Defendants, through their common owners, operators, and directors, including Omid Ilkhan, Amir Halataei, Mehran Halataei, and Jodi Cowley Mahdavi, conspired and schemed together and with the Borrower Defendants to fraudulently induce SECU into making loans to the Borrower Defendants and to use the proceeds of these loans as *de facto* floor plan financing.

31.     Each Borrower Defendant applied for one or more loans from SECU for the represented purpose of purchasing a specific used motor vehicle from one of the Dealer Defendants.  In support of the loan application, the Borrower Defendant provided SECU either with a fully executed purchase agreement or with information regarding the year, make, model, vehicle identification number, and mileage of the used motor vehicle that was supposedly being purchased.  On information and belief, Omid Ilkhan, Amir Halataei, Mehran Halataei, or Jodi Cowley Mahdavi signed the bogus purchase agreements and/or provided to the Borrower Defendant the fictitious information concerning the used motor vehicle that was supposedly being purchased.

32.     Among other information, each purchase agreement contained the Borrower Defendant's name, address, telephone number, date of birth and identified the used motor vehicle that was purportedly being sold by year, make, model, color, vehicle identification number and odometer reading.  The purchase agreement also identified the purported purchase price of the vehicle as well as the unpaid balance due, which was often referred to in the agreement as the amount to be financed.  In instances where a purchase agreement was not provided, the Borrower Defendant provided SECU with similar information regarding the specific used motor vehicle that was purportedly being purchased.

33.     In reliance on the purchase agreement and/or other similar information provided by the Borrower Defendant in the loan documents, SECU agreed to extend credit in the form of a loan to the Borrower Defendant for the express and limited purpose of financing the Borrower Defendant's purchase of the used motor vehicle identified in the agreement and/or the loan documents.  In exchange, the Borrower Defendant agreed to, among other obligations, pledge the identified used motor vehicle as collateral to secure payment of the loan.

34.     Every purchase agreement provided by the Borrower Defendants to SECU was fraudulent and the information in the loan documents regarding the purported sale of the used motor vehicle was fictitious.  The Borrower Defendants did not intend to and did not purchase the used motor vehicles identified in the purchase agreements and/or the loan documents.  Similarly, the Dealer Defendants did not intend to and did not sell the used motor vehicle identified in the purchase agreements and/or the loan documents.  Each alleged transaction between a Borrower Defendant and a Dealer Defendant was a sham perpetrated by Defendants to fraudulently induce SECU into making loans for their own personal benefit.

10

35.     For each loan made by SECU, the Borrower Defendant received a loan check in an amount equal to or not to exceed the represented purchase price.  Each loan check was made payable to the applicable Dealer Defendant by SECU or was subsequently made payable to the Dealer Defendant by the Borrower Defendant or Omid Ilkhan, Amir Halataei, Mehran Halataei, or Jodi Cowley Mahdavi.

36.     In furtherance of the scheme and conspiracy to defraud SECU, each Borrower Defendant gave the loan check to one of the Dealer Defendants without receiving anything in return.  Upon information and belief, the Dealer Defendants and/or Omid Ilkhan, Amir Halataei, Mehran Halataei, or Jodi Cowley Mahdavi financially compensated the Borrower Defendants or provided other consideration for their agreement and participation in the conspiracy and scheme to defraud SECU.

37.     Upon receipt of a loan check, the Dealer Defendant to which the check was payable endorsed the check, deposited the check into its bank account, and received the proceeds of the check for its own use and benefit and/or for the use and benefit of Omid Ilkhan, Amir Halataei, Mehran Halataei, and Jodi Cowley Mahdavi.

38.     By endorsing a loan check, the Dealer Defendant expressly acknowledged and represented that it would take all necessary steps to cause SECU to have a perfected first lien interest in the used motor vehicle that the Borrower Defendant represented he or she was purchasing and further agreed that SECU would be the only lienholder on that vehicle.  For those checks that also included information about the year, make, model, vehicle identification number and mileage of the used motor vehicle, the Dealer Defendant also represented that it sold that vehicle to the Borrower Defendant.   The Dealer Defendants made these representations and

warranties knowing that they were false, without having any intent to take any steps whatsoever to sell the used motor vehicles to the Borrower Defendants and to provide SECU with a perfected security interest in any of the vehicles, and knowing that SECU would rely on this information and the endorsements in paying the loan checks. Indeed, the Dealer Defendants knew that the transactions with the Borrower Defendants were a sham and that no used motor vehicle was ever actually sold to or purchased by the Borrower Defendants.

39.     As intended by the Defendants, SECU relied on the endorsements of the Dealer Defendants in paying the loan checks and sent the proceeds of each loan check by wire to the Dealer Defendants' banks for deposit into a bank account owned or operated by a Dealer Defendant and/or Omid Ilkhan, Amir Halataei, Mehran Halataei, and Jodi Cowley Mahdavi.

40.     Upon information and belief, the Dealer Defendants used the proceeds of SECU's loans to purchase and acquire used motor vehicles – and sometimes the same vehicles identified on the bogus purchase agreements or in the loan documents – which they then sold to unsuspecting third party consumers.

41.     Upon information and belief, none of the Borrower Defendants ever owned or possessed the used motor vehicle identified on the purchase agreement or loan documents he or she signed and provided to SECU. According to the motor vehicle records of Maryland and Virginia, each of the used motor vehicles identified on the bogus purchase agreements or in the loan documents is owned by someone other than the Borrower Defendant and is subject to a lien in favor of someone other than SECU.

42.     As a result of Defendants' conspiracy to defraud SECU and other acts and affirmative misrepresentations, SECU made loans in excess of $750,000 under false pretenses

12

and with the expectation that each loan would be secured with SECU having a perfected first lien security interest in the used motor vehicle that the Borrower Defendant represented he or she was purchasing and that the Dealer Defendant represented it was selling. But, because the underlying transactions were a sham, SECU does not have a perfected security interest in any of the used motor vehicles and, as a result, the loans are unsecured.

**The Loan Transactions Included In The Conspiracy And Scheme To Defraud SECU**

### A. Defendant Anna L. Cowley

#### Cowley Loan No. 1 / Ultimate Auto

43.     In September 2015, Anna L. Cowley ("Ms. Cowley") applied for and subsequently received a loan from SECU for the stated and express purpose of buying a motor vehicle. On October 16, 2015, Ms. Cowley entered into an Auto Check Loan Agreement, Security Agreement, and Disclosures ("Cowley Loan Agreement 1") with SECU pursuant to which she borrowed the principal amount of $24,991.70 for the alleged purchase of a used 2014 Chrysler Town & Country, VIN 2C4RC1BG7ER447744 ("Cowley Vehicle 1") from Ultimate Auto. As a condition of the loan, Ms. Cowley was obligated to pledge Cowley Vehicle 1 as collateral to secure payment of the loan, and SECU was to receive a perfected, first lien security interest in Cowley Vehicle 1.

44.     Pursuant to Cowley Loan Agreement 1, Ms. Cowley, among other obligations, (a) agreed to use the loan proceeds for the purpose of purchasing a used motor vehicle; (b) promised not to submit false or inaccurate information; (c) promised to fully and accurately complete the loan check, including making sure the year, make, model, VIN, and mileage of Cowley Vehicle 1 was filled in accurately and completely; (d) represented and warranted that she

had good title to Cowley Vehicle 1, free of all security interests, and (e) agreed that she would not sell or transfer Cowley Vehicle 1 without SECU's prior consent.

45.     SECU provided Ms. Cowley with a check to purchase Cowley Vehicle 1. The check was then made payable to "Ultimate Auto" in the amount of $24,991.70, and information about the vehicle including its year, make, model, VIN, and mileage was handwritten on the face of the check.

46.     Ms. Cowley endorsed the back of the check and so did Ultimate Auto. By endorsing the check, Ms. Cowley represented to SECU that she was purchasing Cowley Vehicle 1 from Ultimate Auto, and Ultimate Auto represented to SECU that it was selling that same vehicle to Ms. Cowley. Ultimate Auto also acknowledged and expressly represented that it would take all steps to perfect SECU's first lien position interest in Cowley Vehicle 1. Both Ms. Cowley and Ultimate Auto knew that this was false, that no motor vehicle was being sold or purchased, and that SECU would never receive a first lien interest in Cowley Vehicle 1. Ms. Cowley with the other Defendants conspired together to provide this fictitious information, knowing that SECU would rely on it to make the loan to Ms. Cowley. SECU did, in fact, rely on this fictitious information in paying the check and providing the loan proceeds to Ultimate Auto in the amount of $24,991.70.

47.     The purported transaction between Ultimate Auto and Ms. Cowley involving the alleged sale and purchase of Cowley Vehicle 1 was a sham. Ultimate Auto did not sell and did not intend to sell Cowley Vehicle 1 to Ms. Cowley, and Ms. Cowley did not purchase and did not intend to purchase Cowley Vehicle 1 from Ultimate Auto.

48.     Rather, Cowley Vehicle 1, which was supposedly sold by Ultimate Auto and purchased by Ms. Cowley on in October 2015, was owned and has been owned by Co-Defendant Jodi Cowley Mahdavi - Ms. Cowley's sister and an officer, shareholder, and/or director of Auto Select Inc. - since September 3, 2015. Ultimate Auto fraudulently represented to SECU that it sold Cowley Vehicle 1 to Ms. Cowley in October 2015 because Ultimate Auto knew that Cowley Vehicle 1 was owned and has been owned by Jodi Cowley Mahdavi since September 2015 because that is when Ultimate Auto filed its security interest in the vehicle.

49.     In addition to conspiring with Defendants to defraud SECU into making the loan for their own personal benefit, Ms. Cowley breached and is in default of Cowley Loan Agreement 1. Ms. Cowley did not use the loan proceeds for the stated and express purpose of purchasing Cowley Vehicle 1 as promised but rather participated in a fraudulent scheme that resulted in the proceeds of her loan being paid to Ultimate Auto without Ultimate Auto selling Cowley Vehicle 1 to Ms. Cowley and without SECU receiving and obtaining a perfected first lien security interest in Cowley Vehicle 1. Ms. Cowley also submitted false and inaccurate information to SECU regarding the mileage of Cowley Vehicle 1. Ms. Cowley further misrepresented that she had good title to Cowley Vehicle 1, free of all security interests, when in actuality she knew she did not have any interest, much less, marketable title in the vehicle and therefore was not able to pledge Cowley Vehicle 1 as collateral for the loan or grant SECU a security interest in Cowley Vehicle 1 as was required to secure payment of the loan.

50.     In an effort to conceal their fraud, Defendants made certain payments on Cowley Loan Agreement 1. However, upon learning of the fraud and the material breaches of Cowley Loan Agreement 1, SECU declared the loan in default and demanded payment of the full

outstanding balance from both Ms. Cowley and Ultimate Auto. Despite SECU's demand, Ms. Cowley and Ultimate Auto have refused and otherwise failed to pay SECU for its loss.

**Cowley Loan No. 2 / NEA**

51. In April 2016, Ms. Cowley applied for and subsequently received a loan from SECU for the stated and express purpose of buying another motor vehicle. On June 1, 2016, Ms. Cowley entered into an Auto Check Loan Agreement, Security Agreement, and Disclosures ("Cowley Loan Agreement 2") with SECU pursuant to which she borrowed the principal amount of $54,000.00 for the alleged purchase of a used 2014 Land Rover Range Rover, VIN SALGS2VF8EA133214 ("Cowley Vehicle 2") from NEA. As a condition of the loan, Ms. Cowley was obligated to pledge Cowley Vehicle 2 as collateral to secure payment of the loan, and SECU was to receive a perfected, first lien security interest in Cowley Vehicle 2.

52. Pursuant to Cowley Loan Agreement 2, Ms. Cowley, among other obligations, (a) agreed to use the loan proceeds for the purpose of purchasing a used motor vehicle; (b) promised not to submit false or inaccurate information; (c) promised to fully and accurately complete the loan check, including making sure the year, make, model, VIN, and mileage of Cowley Vehicle 2 is filled in accurately and completely; (d) represented and warranted that she had good title to Cowley Vehicle 2, free of all security interests, and (e) agreed that she would not sell or transfer Cowley Vehicle 2 without SECU's prior consent.

53. SECU provided Ms. Cowley with a check to purchase Cowley Vehicle 2. The check was then made payable to "NEA, inc." in the amount of $54,000.00, and information about the vehicle including its year, make, model, VIN, and mileage was handwritten on the face of the check.

16

54.     Ms. Cowley endorsed the back of the check and so did NEA.  By endorsing the check, Ms. Cowley represented to SECU that she was purchasing Cowley Vehicle 2 from NEA, and NEA represented to SECU that it was selling that same vehicle to Ms. Cowley.  NEA also acknowledged and expressly represented that it would take all steps to perfect SECU's first lien position interest in Cowley Vehicle 2.  Both Ms. Cowley and NEA knew that this was false, that no motor vehicle was being sold or purchased, and that SECU would never receive a first lien interest in Cowley Vehicle 2.  Ms. Cowley with the other Defendants conspired together to provide this fictitious information, knowing that SECU would rely on it to make the loan to Ms. Cowley.  SECU did, in fact, rely on this fictitious information in paying the check and providing the loan proceeds to NEA in the amount of $54,000.

55.     The purported transaction between NEA and Ms. Cowley involving the alleged sale and purchase of Cowley Vehicle 2 was a sham.  NEA did not sell and did not intend to sell Cowley Vehicle 2 to Ms. Cowley, and Ms. Cowley did not purchase and did not intend to purchase Cowley Vehicle 2 from NEA.

56.     Rather, according to a Retail Purchase Agreement between Ms. Cowley and Co-Defendant Ultimate Auto, Ms. Cowley already owned Cowley Vehicle 2, having purchased the vehicle from Ultimate Auto almost nine months earlier on September 23, 2015.   Upon information and belief, this Retail Purchase Agreement is also bogus in that Ultimate Auto never sold Cowley Vehicle 2 to Ms. Cowley, and Ms. Cowley never purchased Cowley Vehicle 2 from Ultimate Auto.  Indeed, neither the Maryland Department of Motor Vehicles nor the Virginia equivalent has any record identifying Ms. Cowley as the registered owner of Cowley Vehicle 2.

57.     Defendants conspired together to defraud SECU into making the loan to Ms. Cowley and upon payment of the loan proceeds, NEA used the proceeds to purchase a different vehicle, which it then sold to an unsuspecting third party. This resulted in NEA being paid twice for the sale of one vehicle. And, Ms. Cowley did not use the proceeds of SECU's loan to purchase Cowley Vehicle 2 from NEA and, therefore, was not able to pledge Cowley Vehicle 2 as collateral for the loan or grant SECU a security interest in Cowley Vehicle 2.

58.     In addition to conspiring with Defendants to defraud SECU into making the loan for their own personal benefit, Ms. Cowley breached and is in default of the Cowley Loan Agreement 2. Ms. Cowley did not use the loan proceeds for the stated and express purpose of purchasing Cowley Vehicle 2 as promised but rather participated in a fraudulent scheme that resulted in the proceeds of her loan being paid to NEA without NEA selling Cowley Vehicle 2 to Ms. Cowley and without SECU receiving and obtaining a first lien position in Cowley Vehicle 2. Ms. Cowley also misrepresented that she had good title to Cowley Vehicle 2, free of all security interests, and therefore was not able to pledge Cowley Vehicle 2 as collateral for the loan or grant SECU a security interest in Cowley Vehicle 2 as was required to secure payment of the loan.

59.     In an effort to conceal their fraud, Defendants made certain payments on Cowley Loan Agreement 2. However, upon learning of the fraud and the material breaches of Cowley Loan Agreement 2, SECU declared the loan in default and demand payment of the full outstanding balance from both Ms. Cowley and NEA. Despite SECU's demand, Ms. Cowley and NEA have refused and otherwise failed to pay SECU for its loss.

**Cowley Loan No. 3 / Priceless of Odenton**

60.     In February 2017, Ms. Cowley applied for and subsequently received a loan from SECU for the stated and express purpose of buying a third motor vehicle. On February 28, 2017, Ms. Cowley entered into a Closed-End Note, Disclosure, Loan and Security Agreement ("Cowley Loan Agreement 3") with SECU pursuant to which she borrowed the principal amount of $65,000.00, for the alleged purchase of a used 2014 Land Rover Range Rover, VIN SALGS2EF3EA146811 ("Cowley Vehicle 3"), from Priceless of Odenton. As a condition of the loan, Ms. Cowley was obligated to pledge Cowley Vehicle 1 as collateral to secure payment of the loan, and SECU was to receive a perfected, first lien security interest in Cowley Vehicle 3.

61.     Ms. Cowley provided SECU with a Retail Purchase Agreement between her and Priceless of Odenton reflecting the purported sale of Cowley Vehicle 3. The Retail Purchase Agreement was a sham. Ms. Cowley with the other Defendants conspired together to create the bogus Retail Purchase Agreement, knowing that SECU would rely on it to make the loan to Ms. Cowley. SECU did, in fact, rely on the bogus Retail Purchase Agreement in extending the loan to Ms. Cowley

62.     Pursuant to Cowley Loan Agreement 3, Ms. Cowley, among other obligations, (a) agreed to use the loan proceeds for the purpose of purchasing a used motor vehicle; (b) promised not to submit false or inaccurate information; (c) represented and warranted that she had good title to Cowley Vehicle 3, free of all security interests, and (d) agreed that she would not sell or transfer Cowley Vehicle 3 without SECU's prior consent.

63.     SECU provided Ms. Cowley with a loan check to purchase Cowley Vehicle 3. The check was made payable to "Priceless of Odenton" in the amount of $65,000.00.

19

64.     Priceless of Odenton endorsed the back of the check and deposited the check into its bank account. By endorsing the check, Priceless of Odenton acknowledged and expressly represented that it would take all steps to perfect SECU's first lien position interest in Cowley Vehicle 3. In reliance on the endorsement and Ms. Cowley's representations, agreements and obligations set forth in Cowley Loan Agreement 3, SECU paid the check and Priceless of Odenton received loan proceeds in the amount of $65,000.00.

65.     Priceless of Odenton's acknowledgment and representation in the endorsement was false, and Priceless of Odenton knew it was false at the time it placed the endorsement on the check. Priceless of Odenton did not have any intent to take any steps whatsoever to perfect SECU's first lien position interest in Cowley Vehicle 3.

66.     The purported transaction between Priceless of Odenton and Ms. Cowley involving the alleged sale and purchase of Cowley Vehicle 3 was a sham. Priceless of Odenton did not sell and did not intend to sell Cowley Vehicle 3 to Ms. Cowley, and Ms. Cowley did not purchase and did not intend to purchase Cowley Vehicle 3 from Priceless of Odenton.

67.     Rather, Cowley Vehicle 3, which was supposedly sold by Priceless of Odenton and purchased by Ms. Cowley on February 28, 2017, was owned and has been owned by a different dealership since February 7, 2017. In other words, Priceless of Odenton did not even possess or own Cowley Vehicle 3 on February 28, 2017, thus making it impossible for Ms. Cowley to have purchased Cowley Vehicle 3 from Priceless of Odenton as represented to SECU in the bogus Retail Purchase Agreement.

68.     Defendants conspired together to defraud SECU into making the loan to Ms. Cowley and upon payment of the loan proceeds, Priceless of Odenton used the proceeds to

purchase a different vehicle, which it then sold to an unsuspecting third party. This resulted in Priceless of Odenton being paid twice for the sale of one vehicle. And, Ms. Cowley did not use the proceeds of SECU's loan to purchase Cowley Vehicle 3 from Priceless of Odenton and, therefore, was not able to pledge Cowley Vehicle 3 as collateral for the loan or grant SECU a security interest in Cowley Vehicle 3.

69.    In addition to conspiring with Defendants to defraud SECU into making the loan for their own personal benefit, Ms. Cowley breached and is in default of the Cowley Loan Agreement 3. Ms. Cowley did not use the loan proceeds for the stated and express purpose of purchasing Cowley Vehicle 3 as promised but rather participated in a fraudulent scheme that resulted in the proceeds of her loan being paid to Priceless of Odenton without Priceless of Odenton selling Cowley Vehicle 3 to Ms. Cowley and without SECU receiving and obtaining a first lien position in Cowley Vehicle 3 as required by Cowley Loan Agreement 3. Ms. Cowley also misrepresented that she had good title to Cowley Vehicle 3, free of all security interests, when in actuality she knew she did not have any interest, much less, marketable title in the vehicle and therefore was not able to pledge Cowley Vehicle 3 as collateral for the loan or grant SECU a security interest in Cowley Vehicle 3 as was required to secure payment of the loan.

70.    In an effort to conceal their fraud, Defendants made certain payments on Cowley Loan Agreement 3. However, upon learning of the fraud and the material breaches of Cowley Loan Agreement 3, SECU declared the loan in default and demand payment of the full outstanding balance from both Ms. Cowley and Priceless of Odenton. Despite SECU's demand, Ms. Cowley and Priceless of Odenton have refused and otherwise failed to pay SECU for its loss.

**B. Defendant Mitzi Cowley Davis**

71.     In August 2015, Mitzi Cowley Davis ("Ms. Cowley Davis") applied for and subsequently received a loan from SECU for the stated and express purpose of buying a motor vehicle. On September 4, 2015, Ms. Cowley Davis entered into a Closed-End Note, Disclosure, Loan and Security Agreement (the "Davis Loan Agreement") with SECU pursuant to which she borrowed the principal amount of $74,793.70, for the alleged purchase of a used 2015 Mercedes-Benz GL450, VIN 4JGDF6EE7FA463243 (the "Davis Vehicle"), from Ultimate Auto. As a condition of the loan, Ms. Cowley Davis was obligated to pledge the Davis Vehicle as collateral to secure payment of the loan, and SECU was to receive a perfected, first lien security interest in the Davis Vehicle.

72.     Ms. Cowley Davis provided SECU with a Retail Purchase Agreement between her and Ultimate Auto reflecting the purported sale of the Davis Vehicle. The Retail Purchase Agreement was a sham. Ms. Cowley Davis with the other Defendants conspired together to create the bogus Retail Purchase Agreement, knowing that SECU would rely on it to make the loan to Ms. Cowley Davis. SECU did, in fact, rely on the bogus Retail Purchase Agreement in extending the loan to Ms. Cowley Davis.

73.     Pursuant to the Davis Loan Agreement, Ms. Cowley Davis, among other obligations,        (a) agreed to use the loan proceeds for the purpose of purchasing a used motor vehicle; (b) promised not to submit false or inaccurate information; (c) represented and warranted that she had good title to the Davis Vehicle, free of all security interests, and (d) agreed that she would not sell or transfer the Davis Vehicle without SECU's prior consent.

74.     SECU provided Ms. Cowley Davis with a loan check to purchase the Davis Vehicle.  The check was made payable to "Ultimate Auto" in the amount of $74,793.70.

75.     Ultimate Auto endorsed the back of the check and deposited the check into its bank account. By endorsing the check, Ultimate Auto acknowledged and expressly represented that it would take all steps to perfect SECU's first lien position interest in the Davis Vehicle.  In reliance on the endorsement and Ms. Cowley Davis's representations, representations, agreements and obligations set forth in the Davis Loan Agreement, SECU paid the check and Ultimate Auto received loan proceeds in the amount of $74,793.70.

76.     Ultimate Auto's acknowledgment and representation in the endorsement was false, and Ultimate Auto knew it was false at the time it placed the endorsement on the check. Ultimate Auto did not have any intent to take any steps whatsoever to perfect SECU's first lien position interest in the Davis Vehicle.

77.     The purported transaction between Ultimate Auto and Ms. Cowley Davis involving the alleged sale and purchase of the Davis Vehicle was a sham.  Ultimate Auto did not sell and did not intend to sell the Davis Vehicle to Ms. Cowley Davis, and Ms. Cowley Davis did not purchase and did not intend to purchase the Davis Vehicle from Ultimate Auto.  As a result, SECU does not have and never had a perfected security interest in the Davis Vehicle.

78.     Rather, the Davis Vehicle, which was supposedly sold by Ultimate Auto and purchased by Ms. Cowley Davis on September 2015, was not actually purchased by Ms. Cowley Davis until October 2015 and when she allegedly purchased the Davis Vehicle she financed the purchase with a loan from a lender other than SECU.  According to Maryland's Department of Motor Vehicles, Ms. Cowley Davis has been the registered owner of the Davis Vehicle since

October 10, 2015, which is also when Gateway One Lending & Finance perfected its first lien on the Davis Vehicle.

79.     Defendants conspired together to defraud SECU into making the loan to Ms. Cowley Davis and upon payment of the loan proceeds, Ultimate Auto used the proceeds either to purchase the Davis Vehicle  and sell that vehicle free and clear to Ms. Cowley Davis or to purchase a different vehicle, which it then sold to an unsuspecting third party.  Either way, Ultimate Auto was paid twice for the sale of one vehicle.  And, Ms. Cowley Davis did not use the proceeds of SECU's loan to purchase the Davis Vehicle from Ultimate Auto in September 2015 and, therefore, was not able to pledge the Davis Vehicle as collateral for the loan or grant SECU a security interest in the Davis Vehicle.

80.     In addition to conspiring with Defendants (including her relatives Anna L. Cowley and Jodi Cowley Mahdavi) to defraud SECU, Ms. Cowley Davis breached and is in default of the Davis Loan Agreement.  Ms. Cowley Davis did not use the loan proceeds for the stated and express purpose of purchasing the Davis Vehicle as promised but rather participated in a fraudulent scheme that resulted in the proceeds of her loan being paid to Ultimate Auto without Ultimate Auto selling the Davis Vehicle to Ms. Cowley Davis in September 2015 and without SECU receiving and obtaining a first lien position in the Davis Vehicle as required by the Davis Loan Agreement.  Ms. Cowley Davis also misrepresented that she had good title to the Davis Vehicle, free of all security interests, because she did not yet own the vehicle and therefore was not able to pledge Cowley Vehicle 3 as collateral for the loan or grant SECU a security interest in Cowley Vehicle 3 as was required to secure payment of the loan.

81.    In an effort to conceal their fraud, Defendants made certain payments on the Davis Loan Agreement.  However, upon learning of the fraud and the material breaches of the Davis Loan Agreement, SECU declared the loan in default and demand payment of the full outstanding balance from both Ms. Cowley Davis and Ultimate Auto.  Despite SECU's demand, Ms. Cowley Davis and Ultimate Auto have refused and otherwise failed to pay SECU for its loss.

**C.  Defendant Mohammad Eram**

**Eram Loan No. 1 / NEA, Inc.**

82.    In or around February 2016, Mohammad Eram ("Mr. Eram") applied for and subsequently received a loan from SECU for the stated and express purpose of buying a motor vehicle.  On April 8, 2016, Mr. Eram entered into an Auto Check Loan Agreement, Security Agreement, and Disclosures ("Eram Loan Agreement 1") with SECU pursuant to which he borrowed the principal amount of $29,994.10 for the alleged purchase of a used 2008 Cadillac Escalade, VIN 1GYFK63878R234047 ("Eram Vehicle 1") from NEA.  As a condition of the loan, Mr. Eram was obligated to pledge Eram Vehicle 1 as collateral to secure payment of the loan, and SECU was to receive a perfected, first lien security interest in Eram Vehicle 1.

83.    Pursuant to Eram Loan Agreement 1, Mr. Eram, among other obligations, (a) agreed to use the loan proceeds for the purpose of purchasing a used motor vehicle; (b) promised not to submit false or inaccurate information; (c) promised to fully and accurately complete the loan check, including making sure the year, make, model, VIN, and mileage of Eram Vehicle 1 was filled in accurately and completely; (d) represented and warranted that he had good title to

Eram Vehicle 1, free of all security interests, and (e) agreed that he would not sell or transfer Eram Vehicle 1 without SECU's prior consent.

84.    SECU provided Mr. Eram with a check to purchase Eram Vehicle 1. The check was then made payable to "NEA, inc." in the amount of $24,994.10, and information about the vehicle including its year, make, model, VIN, and mileage was handwritten on the face of the check.

85.    Mr. Eram endorsed the back of the check and so did NEA. By endorsing the check, Ms. Eram represented to SECU that she was purchasing Eram Vehicle 1 from NEA, and NEA represented to SECU that it was selling that same vehicle to Mr. Eram. NEA also acknowledged and expressly represented that it would take all steps to perfect SECU's first lien position interest in Eram Vehicle 1. Both Mr. Eram and NEA knew that this was false, that no motor vehicle was being sold or purchased, and that SECU would never receive a first lien interest in Eram Vehicle 1. Mr. Eram with the other Defendants conspired together to provide this fictitious information, knowing that SECU would rely on it to make the loan to Ms. Eram. SECU did, in fact, rely on this fictitious information in paying the check and providing the loan proceeds to NEA in the amount of $24,994.10.

86.    The purported transaction between NEA and Mr. Eram involving the alleged sale and purchase of Eram Vehicle 1 was a sham. NEA did not sell and did not intend to sell Eram Vehicle 1 to Mr. Eram, and Mr. Eram did not purchase and did not intend to purchase Eram Vehicle 1 from NEA.

87.    Rather, Eram Vehicle 1, which was supposedly sold by NEA and purchased by Mr. Eram in April 2016, was owned at the time by Co-Defendant Auto Source, Inc. - the same

company for which Mr. Eram used to be President and majority shareholder,. Auto Source, Inc. became the registered owner of Eram Vehicle 1 sometime in December 2015 and remained the owner throughout 2016. Moreover, NEA fraudulently represented to SECU that it sold Eram Vehicle 1 to Mr. Eram in April 2016 because NEA knew at that time that Eram Vehicle 1 was owned and has been owned by Co-Defendant Auto Source, Inc. since December 2015. In other words, NEA did not even possess or own Eram Vehicle 1 on April 8, 2016, thus making it impossible for Mr. Eram to have purchased Eram Vehicle 1 from NEA as represented to SECU in connection with applying for and obtaining the loan.

88.     In addition to conspiring with Defendants to defraud SECU into making the loan for their own personal benefit, Mr. Eram breached and is in default of the Eram Loan Agreement 1. Mr. Eram did not use the loan proceeds for the stated and express purpose of purchasing Eram Vehicle 1 as promised but rather participated in a fraudulent scheme that resulted in the proceeds of her loan being paid to NEA without NEA selling Eram Vehicle 1 to Mr. Eram and without SECU receiving and obtaining a first lien position in Eram Vehicle 1. Mr. Eram also misrepresented that he had good title to Eram Vehicle 1, free of all security interests, when in actuality he knew he did not have any interest, much less, marketable title in the vehicle and therefore was not able to pledge Eram Vehicle 1 as collateral for the loan or grant SECU a security interest in Eram Vehicle 1 as was required to secure payment of the loan.

89.     In an effort to conceal their fraud, Defendants made certain payments on Eram Loan Agreement 1. However, upon learning of the fraud and the material breaches of Eram Loan Agreement 1, SECU declared the loan in default and demand payment of the full

outstanding balance from both Mr. Eram and NEA.  Despite SECU's demand, Mr. Eram and NEA have refused and otherwise failed to pay SECU for its loss.

**Eram Loan No. 2 / Priceless of Odenton**

90.     In or around December 2016, Mr. Eram applied for and subsequently received a loan from SECU for the stated and express purpose of buying another motor vehicle.  On December 22, 2016, Mr. Eram entered into a Closed-End Note, Disclosure, Loan and Security Agreement ("Eram Loan Agreement 2") with SECU pursuant to which he borrowed the principal amount of $74,995.00, for the alleged purchase of a used 2016 Cadillac Escalade, VIN 1GYS4KKJ3GR150053 ("Eram Vehicle 2") from Priceless of Odenton.  As a condition of the loan, Mr. Eram was obligated to pledge Eram Vehicle 2 as collateral to secure payment of the loan, and SECU was to receive a perfected, first lien security interest in Eram Vehicle 2.

91.     Mr. Eram provided SECU with a Retail Purchase Agreement between him and Priceless of Odenton reflecting the purported sale of Eram Vehicle 2.  The Retail Purchase Agreement was a sham.  Mr. Eram with the other Defendants conspired together to create the bogus Retail Purchase Agreement, knowing that SECU would rely on it to make the loan to Mr. Eram.  SECU did, in fact, rely on the bogus Retail Purchase Agreement in extending the loan to Mr. Eram.

92.     SECU provided Mr. Eram with a loan check to purchase Eram Vehicle 2.  The check was made payable to "Priceless of Odenton" in the amount of $74,995.00.

93.     Priceless of Odenton endorsed the back of the check and deposited the check into its bank account. By endorsing the check, Priceless of Odenton acknowledged and expressly represented that it would take all steps to perfect SECU's first lien position interest in Eram

Vehicle 2.  In reliance on the endorsement and Mr. Eram's representations, agreements and obligations set forth in Eram Loan Agreement 2, SECU paid the check and Priceless of Odenton received loan proceeds in the amount of $74,995.00.

94.     Priceless of Odenton's acknowledgment and representation in the endorsement was false, and Priceless of Odenton knew it was false at the time it placed the endorsement on the check.  Priceless of Odenton did not have any intent to take any steps whatsoever to perfect SECU's first lien position interest in Eram Vehicle 2.

95.     The purported transaction between Priceless of Odenton and Mr. Eram involving the alleged sale and purchase of Eram Vehicle 2 was a sham.  Priceless of Odenton did not sell and did not intend to sell Eram Vehicle 2 to Mr. Eram, and Mr. Eram did not purchase and did not intend to purchase Eram Vehicle 2 from Priceless of Odenton.

96.     Rather, Eram Vehicle 2, which was supposedly sold by Priceless of Odenton and purchased by Mr. Eram in December 2016, is owned by Rodney Lewis Cowley, a relative of Co-Defendants Anna L. Cowley, Jodi Cowley Mahdavi, and Mitzi Cowley Davis.  According to Maryland's Department of Motor Vehicles, Rodney Lewis Cowley has been the registered owner of Eram Vehicle 2 since February 2017, which is also when Pentagon Federal Credit Union perfected its first lien on Eram Vehicle 2.

97.     Defendants conspired together to defraud SECU into making the loan to Mr. Eram and upon payment of the loan proceeds, Priceless of Odenton used the proceeds to either purchase Eram Vehicle 2 and sell that vehicle free and clear to Rodney Lewis Cowley or to purchase a different vehicle, which it then sold to an unsuspecting third party.  Either way, Priceless of Odenton was paid twice for the sale of one vehicle.  And, Mr. Eram did not use the

proceeds of SECU's loan to purchase Eram Vehicle 2 from Priceless of Odenton and, therefore, was not able to pledge Eram Vehicle 2 as collateral for the loan or grant SECU a security interest in Eram Vehicle 2.

98.     In addition to conspiring with Defendants to defraud SECU into making the loan for their own personal benefit, Mr. Eram breached and is in default of the Eram Loan Agreement 2. Mr. Eram did not use the loan proceeds for the stated and express purpose of purchasing Eram Vehicle 2 as promised but rather participated in a fraudulent scheme that resulted in the proceeds of her loan being paid to Priceless of Odenton without Priceless of Odenton selling Eram Vehicle 2 to Mr. Eram and without SECU receiving and obtaining a first lien position in Eram Vehicle 2 as required by Eram Loan Agreement 2. Mr. Eram also misrepresented that he had good title to Eram Vehicle 2, free of all security interests, when in actuality he knew he did not have any interest, much less, marketable title in the vehicle and therefore was not able to pledge Eram Vehicle 2 as collateral for the loan or grant SECU a security interest in Eram Vehicle 2 as was required to secure payment of the loan.

99.     In an effort to conceal their fraud, Defendants made certain payments on Eram Loan Agreement 2. However, upon learning of the fraud and the material breaches of Eram Loan Agreement 2, SECU declared the loan in default and demand payment of the full outstanding balance from both Mr. Eram and Priceless of Odenton. Despite SECU's demand, Mr. Eram and Priceless of Odenton have refused and otherwise failed to pay SECU for its loss.

**D. Defendant Diana Kneipp**

**Kneipp Loan No. 1 / Ultimate Auto**

100.    In or around June 20165, Diana Kneipp ("Ms. Kneipp") applied for and subsequently received a loan from SECU for the stated and express purpose of buying a motor vehicle.  On June 17, 2015, Ms. Kneipp entered into a Closed-End Note, Disclosure, Loan and Security Agreement ("Kneipp Loan Agreement 1") with SECU pursuant to which she borrowed the principal amount of $30,177.00, for the purchase of a used 2010 BMW 3-Series, VIN WBAWL1C53AP491796 ("Kneipp Vehicle 1"), from Ultimate Auto.  As a condition of the loan, Ms. Kneipp was obligated to pledge Kneipp Vehicle 1 as collateral to secure payment of the loan, and SECU was to receive a perfected, first lien security interest in Kneipp Vehicle 1.

101.    Ms. Kneipp provided SECU with a Retail Purchase Agreement between her and Ultimate Auto reflecting the purported sale of Kneipp Vehicle 1.   The Retail Purchase Agreement was a sham.  Ms. Kneipp with the other Defendants conspired together to create the bogus Retail Purchase Agreement, knowing that SECU would rely on it to make the loan to Ms. Kneipp.  SECU did, in fact, rely on the bogus Retail Purchase Agreement in extending the loan to Ms. Kneipp.

102.    Pursuant to Kneipp Loan Agreement 1, Ms. Kneipp, among other obligations, (a) agreed to use the loan proceeds for the purpose of purchasing a used motor vehicle; (b) promised not to submit false or inaccurate information; (c) represented and warranted that she had good title to Kneipp Vehicle 1, free of all security interests, and (d) agreed that she would not sell or transfer Kneipp Vehicle 1 without SECU's prior consent.

31

103.    SECU provided Ms. Kneipp with a loan check to purchase Kneipp Vehicle 1. The check was made payable to "Ultimate Auto" in the amount of $29,827.00.

104.    Ultimate Auto endorsed the back of the check and deposited the check into its bank account.  By endorsing the check, Ultimate Auto acknowledged and expressly represented that it would take all steps to perfect SECU's first lien position interest in Kneipp Vehicle 1.  In reliance on the endorsement and Ms. Kneipp's representations, agreements and obligations set forth in Kneipp Loan Agreement 1, SECU paid the check and Ultimate Auto received loan proceeds in the amount of $29,827.00.

105.    Ultimate Auto's acknowledgment and representation in the endorsement was false, and Ultimate Auto knew it was false at the time it placed the endorsement on the check. Ultimate Auto did not have any intent to take any steps whatsoever to perfect SECU's first lien position interest in Kneipp Vehicle 1.

106.    The purported transaction between Ultimate Auto and Ms. Kneipp involving the alleged sale and purchase of Kneipp Vehicle 1 was a sham.  Ultimate Auto did not sell and did not intend to sell Kneipp Vehicle 1 to Ms. Kneipp, and Kneipp did not purchase and did not intend to purchase Kneipp Vehicle 1 from Ultimate Auto.

107.    Rather, Kneipp Vehicle 1, which was supposedly sold by Ultimate Auto and purchased by Ms. Kneipp on June 15, 2015, was purchased by Sunil Kumar Chaudhary six months later in December 2015.  According to Maryland's Department of Motor Vehicles, Sunil Kumar Chaudhary has been the registered owner of Kneipp Vehicle 1 since December 31, 2015, which is also when Gateway One Lending & Finance filed its security interest in Kneipp Vehicle 1.

32

108.    Defendants conspired together to defraud SECU into making the loan to Ms. Kneipp and upon payment of the loan proceeds, Ultimate Auto used the proceeds either to purchase Kneipp Vehicle 1 and sell that vehicle free and clear to Sunil Kumar Chaudhary or to purchase a different vehicle, which it then sold to an unsuspecting third party.  Either way, Ultimate Auto was paid twice for the sale of one vehicle.  And, Ms. Kneipp did not use the proceeds of SECU's loan to purchase Kneipp Vehicle 1 from Ultimate Auto and, therefore, was not able to pledge Kneipp Vehicle 1 as collateral for the loan or grant SECU a security interest in Kneipp Vehicle 1.

109.    In addition to conspiring with Defendants to defraud SECU into making the loan for their own personal benefit, Ms. Kneipp breached and is in default of the Kneipp Loan Agreement 1.  Ms. Kneipp did not use the loan proceeds for the stated and express purpose of purchasing Kneipp Vehicle 1 as promised but rather participated in a fraudulent scheme that resulted in the proceeds of her loan being paid to Ultimate Auto without Ultimate Auto selling Kneipp Vehicle 1 to Ms. Kneipp and without SECU receiving and obtaining a first lien position in Kneipp Vehicle 1 as required by Kneipp Loan Agreement 1.  Ms. Kneipp also misrepresented that she had good title to Kneipp Vehicle 1, free of all security interests, when in actuality she knew she did not have any interest, much less, marketable title in the vehicle and therefore was not able to pledge Kneipp Vehicle 1 as collateral for the loan or grant SECU a security interest in Kneipp Vehicle 1 as was required to secure payment of the loan.

110.    In an effort to conceal their fraud, Defendants made certain payments on Kneipp Loan Agreement 1.  However, upon learning of the fraud and the material breaches of Kneipp Loan Agreement 1, SECU declared the loan in default and demand payment of the full

outstanding balance from both Ms. Kneipp and Ultimate Auto.  Despite SECU's demand, Ms. Kneipp and Ultimate Auto have refused and otherwise failed to pay SECU for its loss.

**Kneipp Loan No. 2 / Auto Select**

111.    In or around September 2015, Ms. Kneipp applied for and subsequently received a loan from SECU for the stated and express purpose of buying another motor vehicle.  On October 16, 2015, Ms. Kneipp entered into an Auto Check Loan Agreement, Security Agreement, and Disclosures ("Kneipp Loan Agreement 2") with SECU pursuant to which she borrowed the principal amount of $24,991.37 for the alleged purchase of a used 2008 Mercedes-Benz ML350, VIN 4JGBB86E98A368618 ("Kneipp Vehicle 2") from Auto Select.  As a condition of the loan, Ms. Kneipp was obligated to pledge Kneipp Vehicle 2 as collateral to secure payment of the loan, and SECU was to receive a perfected, first lien security interest in Kneipp Vehicle 2.

112.    Pursuant to Kneipp Loan Agreement 2, Ms. Kneipp, among other obligations, (a) agreed to use the loan proceeds for the purpose of purchasing a used motor vehicle; (b) promised not to submit false or inaccurate information; (c) promised to fully and accurately complete the loan check, including making sure the year, make, model, VIN, and mileage of Kneipp Vehicle 2 was filled in accurately and completely; (d) represented and warranted that he had good title to Kneipp Vehicle 2, free of all security interests, and (e) agreed that she would not sell or transfer Kneipp Vehicle 2 without SECU's prior consent.

113.    SECU provided Ms. Kneipp with a check to purchase Kneipp Vehicle 2.  The check was then made payable to "Auto Select inc" in the amount of $24,991.37, and information

about the vehicle including its year, make, model, VIN, and mileage was either preprinted or handwritten on the face of the check.

114.    Ms. Kneipp endorsed the back of the check and so did Auto Select.  By endorsing the check, Ms. Kneipp represented to SECU that she was purchasing Kneipp Vehicle 2 from Ultimate Auto, and Auto Select represented to SECU that it was selling that same vehicle to Ms. Kneipp.  Auto Select also acknowledged and expressly represented that it would take all steps to perfect SECU's first lien position interest in Kneipp Vehicle 2.  Both Ms. Kneipp and Auto Select knew that this was false, that no motor vehicle was being sold or purchased, and that SECU would never receive a first lien interest in Kneipp Vehicle 2.  Ms. Kneipp with the other Defendants conspired together to provide this fictitious information, knowing that SECU would rely on it to make the loan to Ms. Kneipp.  SECU did, in fact, rely on this fictitious information in paying the check and providing the loan proceeds to Auto Select in the amount of $24,991.37.

115.    The purported transaction between Auto Select and Ms. Kneipp involving the alleged sale and purchase of Kneipp Vehicle 2 was a sham.  Auto Select did not sell and did not intend to sell Kneipp Vehicle 2 to Ms. Kneipp, and Ms. Kneipp did not purchase and did not intend to purchase Kneipp Vehicle 2 from Auto Select.

116.    Rather, Kneipp Vehicle 2, which was supposedly sold by Auto Select and purchased by Ms. Kneipp in October 2015, was purchased approximately one month later in November 2015 by Ohene Amoafo Mensah and Irene Amoafo, who remain the registered owners of Kneipp Vehicle 2. According to Maryland's Department of Motor Vehicles, Ohene Amoafo Mensah and Irene Amoafo have been the registered owners of Kneipp Vehicle 2 since

35

November 10, 2015, which is also when C&F Finance Company filed its security interest in Kneipp Vehicle 2.

117.    Defendants conspired together to defraud SECU into making the loan to Ms. Kneipp and upon payment of the loan proceeds, Auto Select used the proceeds either to purchase Kneipp Vehicle 2 and sell that vehicle free and clear to Ohene Amoafo Mensah and Irene Amoafo or to purchase a different vehicle, which it then sold to an unsuspecting third party. Either way, Ultimate Auto was paid twice for the sale of only one vehicle. And, Ms. Kneipp did not use the proceeds of SECU's loan to purchase Kneipp Vehicle 2 from Auto Select and, therefore, was not able to pledge Kneipp Vehicle 2 as collateral for the loan or grant SECU a security interest in Kneipp Vehicle 2.

118.    In addition to conspiring with Defendants to defraud SECU into making the loan for their own personal benefit, Ms. Kneipp breached and is in default of the Kneipp Loan Agreement 2. Ms. Kneipp did not use the loan proceeds for the stated and express purpose of purchasing Kneipp Vehicle 2 as promised but rather participated in a fraudulent scheme that resulted in the proceeds of her loan being paid to Auto Select without Auto Select selling Kneipp Vehicle 2 to Ms. Kneipp and without SECU receiving and obtaining a first lien position in Kneipp Vehicle 2 as required by Kneipp Loan Agreement 2. Ms. Kneipp also misrepresented that she had good title to Kneipp Vehicle 2, free of all security interests, when in actuality she knew she did not have any interest, much less, marketable title in the vehicle and therefore was not able to pledge Kneipp Vehicle 2 as collateral for the loan or grant SECU a security interest in Kneipp Vehicle 2 as was required to secure payment of the loan.

119.    In an effort to conceal their fraud, Defendants made certain payments on Kneipp Loan Agreement 2.  However, upon learning of the fraud and the material breaches of Kneipp Loan Agreement 2, SECU declared the loan in default and demand payment of the full outstanding balance from both Ms. Kneipp and Auto Select.  Despite SECU's demand, Ms. Kneipp and Auto Select have refused and otherwise failed to pay SECU for its loss.

**E. Defendant Mehdi Goudarzi**

120.    In or around June 2015, Mehdi Goudarzi ("Mr. Goudarzi") applied for and received a loan from SECU for the stated and express purpose of buying a motor vehicle.  On July 7, 2015, Mr. Goudarzi entered into an Auto Check Loan Agreement, Security Agreement, and Disclosures (the "Goudarzi Loan Agreement") with SECU pursuant to which he borrowed the principal amount of $14,997.88 for the alleged purchase of a used 2007 Infiniti G35, VIN JNKBV61E87M717822 (the "Goudarzi Vehicle") from Ultimate Auto.  As a condition of the loan, Mr. Goudarzi was obligated to pledge the Goudarzi Vehicle as collateral to secure payment of the loan, and SECU was to receive a perfected, first lien security interest in the Goudarzi Vehicle.

121.    Pursuant to the Goudarzi Loan Agreement, Mr. Goudarzi, among other obligations, (a) agreed to use the loan proceeds for the purpose of purchasing a used motor vehicle; (b) promised not to submit false or inaccurate information; (c) promised to fully and accurately complete the loan check, including making sure the year, make, model, VIN, and mileage of the Goudarzi Vehicle was filled in accurately and completely; (d) represented and warranted that he had good title to the Goudarzi Vehicle, free of all security interests, and (e) agreed that he would not sell or transfer the Goudarzi Vehicle without SECU's prior consent.

122.   SECU provided Mr. Goudarzi with a check to purchase the Goudarzi Vehicle. The check was then made payable to "Ultimate Auto" in the amount of $14,997.88, and information about the vehicle including its year, make, model, VIN, and mileage was handwritten on the face of the check.

123.   Mr. Goudarzi endorsed the back of the check and so did Ultimate Auto.  By endorsing the check, Ms. Goudarzi represented to SECU that she was purchasing Goudarzi Vehicle 1 from Ultimate Auto, and Ultimate Auto represented to SECU that it was selling that same vehicle to Mr. Goudarzi.  Ultimate Auto also acknowledged and expressly represented that it would take all steps to perfect SECU's first lien position interest in Goudarzi Vehicle 1.  Both Mr. Goudarzi and Ultimate Auto knew that this was false, that no motor vehicle was being sold or purchased, and that SECU would never receive a first lien interest in Goudarzi Vehicle 1.  Mr. Goudarzi with the other Defendants conspired together to provide this fictitious information, knowing that SECU would rely on it to make the loan to Ms. Goudarzi.  SECU did, in fact, rely on this fictitious information in paying the check and providing the loan proceeds to Ultimate Auto in the amount of $14,997.88.

124.   The purported transaction between Ultimate Auto and Mr. Goudarzi involving the alleged sale and purchase of the Goudarzi Vehicle was a sham.  Ultimate Auto did not sell and did not intend to sell the Goudarzi Vehicle to Mr. Goudarzi, and Mr. Goudarzi did not purchase and did not intend to purchase the Goudarzi Vehicle from Ultimate Auto.

125.   Rather, the Goudarzi Vehicle, which was supposedly sold by Ultimate Auto and purchased by Mr. Goudarzi in July 2015, was purchased by Carmaletha Freeman Holmes several months later on or around September 1, 2015.  Between June 2015 and September 2015, the

Goudarzi Vehicle was driven less than 25 miles. This further supports that Mr. Goudarzi never purchased and/or owned the Goudarzi Vehicle. Instead, Defendants conspired together to defraud SECU into making the loan to Mr. Goudarzi and upon payment of the loan proceeds, Ultimate Auto used the proceeds either to purchase the Goudarzi Vehicle and sell that vehicle free and clear to Carmaletha Freeman Holmes or to purchase a different vehicle, which it then sold to an unsuspecting third party. As a result, Ultimate Auto was paid twice for the sale of only one vehicle. And, Mr. Goudarzi did not use the proceeds of SECU's loan to purchase the Goudarzi Vehicle from Ultimate Auto and, therefore, was not able to pledge the Goudarzi Vehicle as collateral for the loan or grant SECU a security interest in the Goudarzi Vehicle.

126. In addition to conspiring with Defendants to defraud SECU into making the loan for their own personal benefit, Mr. Goudarzi breached and is in default of the Goudarzi Loan Agreement. Mr. Goudarzi did not use the loan proceeds for the stated and express purpose of purchasing the Goudarzi Vehicle as promised but rather participated in a fraudulent scheme that resulted in the proceeds of her loan being paid to Ultimate Auto without Ultimate Auto selling the Goudarzi Vehicle to Mr. Goudarzi and without SECU receiving and obtaining a first lien position in the Goudarzi Vehicle as required by the Goudarzi Loan Agreement. Mr. Goudarzi also misrepresented that he had good title to the Goudarzi Vehicle, free of all security interests, when in actuality he knew he did not have any interest, much less, marketable title in the vehicle and therefore was not able to pledge the Goudarzi Vehicle as collateral for the loan or grant SECU a security interest in the Goudarzi Vehicle as was required to secure payment of the loan.

127. In an effort to conceal their fraud, Defendants made certain payments on the Goudarzi Loan Agreement. However, upon learning of the fraud and the material breaches of

the Goudarzi Loan Agreement, SECU declared the loan in default and demand payment of the full outstanding balance from both Mr. Goudarzi and Ultimate Auto. Despite SECU's demand, Mr. Goudarzi and Ultimate Auto have refused and otherwise failed to pay SECU for its loss.

### F. Defendant Abdolreza Ossareh

128. In or around December 2014, Abdolreza Ossareh ("Ms. Ossareh") applied for and received a loan from SECU for the stated and express purpose of buying a motor vehicle. On December 17, 2014, Ms. Ossareh entered into a Closed-End Note, Disclosure, Loan and Security Agreement ("Ossareh Loan Agreement") with SECU pursuant to which she borrowed the principal amount of $39,249.00, for the alleged purchase of a used 2011 BMW 5 Series, VIN WBAFU7C5XBC870478 (the "Ossareh Vehicle"), from Ultimate Auto. As a condition of the loan, Ms. Ossareh was obligated to pledge the Ossareh Vehicle as collateral to secure payment of the loan, and SECU was to receive a perfected, first lien security interest in the Ossareh Vehicle.

129. Ms. Ossareh provided SECU with a Retail Purchase Agreement between her and Ultimate Auto reflecting the purported sale of the Ossareh Vehicle. The Retail Purchase Agreement was a sham. Ms. Ossareh with the other Defendants conspired together to create the bogus Retail Purchase Agreement, knowing that SECU would rely on it to make the loan to Ms. Ossareh. SECU did, in fact, rely on the bogus Retail Purchase Agreement in extending the loan to Ms. Ossareh.

130. Pursuant to the Ossareh Loan Agreement, Ms. Ossareh, among other obligations, (a) agreed to use the loan proceeds for the purpose of purchasing a used motor vehicle; (b) promised not to submit false or inaccurate information; (c) represented and warranted that she

had good title to the Ossareh Vehicle, free of all security interests, and (d) agreed that she would not sell or transfer the Ossareh Vehicle, without SECU's prior consent.

131.   SECU provided Ms. Ossareh with a loan check to purchase the Ossareh Vehicle. The check was made payable to "Ultimate Auto" in the amount of $38,899.00.

132.   Ultimate Auto endorsed the back of the check and deposited the check into its bank account. By endorsing the check, Ultimate Auto acknowledged and expressly represented that it would take all steps to perfect SECU's first lien position interest in the Ossareh Vehicle. In reliance on the endorsement and Ms. Ossareh's representations, representations, agreements and obligations set forth in the Ossareh Loan Agreement, SECU paid the check and Ultimate Auto received loan proceeds in the amount of $38,899.00.

133.   Ultimate Auto's acknowledgment and representation in the endorsement was false, and Ultimate Auto knew it was false at the time it placed the endorsement on the check. Ultimate Auto did not have any intent to take any steps whatsoever to perfect SECU's first lien position interest in the Ossareh Vehicle.

134.   The purported transaction between Ultimate Auto and Ms. Ossareh involving the alleged sale and purchase of the Ossareh Vehicle was a sham. Ultimate Auto did not sell and did not intend to sell the Ossareh Vehicle to Ms. Ossareh, and Ms. Ossareh did not purchase and did not intend to purchase the Ossareh Vehicle from Ultimate Auto. As a result, SECU does not have and never had a perfected security interest in the Ossareh Vehicle.

135.   Rather, the Ossareh Vehicle, which was supposedly sold by Ultimate Auto and purchased by Ms. Ossareh in December 2014, was purchased by Melvin Earl Spicer eight months earlier on April 22, 2014. According to Maryland's Department of Motor Vehicles,

Melvin Earl Spicer has been the registered owner of the Ossareh Vehicle since April 2014, which is also when TD Auto Finance, LLC perfected its first lien on the Ossareh Vehicle. Accordingly, Ms. Ossareh never purchased and/or owned the Ossareh Vehicle. Instead, Defendants conspired together to defraud SECU into making the loan to Ms. Ossareh and upon payment of the loan proceeds, Ultimate Auto used the proceeds to purchase a different vehicle, which it then sold to an unsuspecting third party. As a result, Ultimate Auto was effectively paid twice for the sale of only one vehicle. And, Ms. Ossareh did not use the proceeds of SECU's loan to purchase the Ossareh Vehicle and, therefore, was not able to pledge the Ossareh Vehicle as collateral for the loan or grant SECU a security interest in the Ossareh Vehicle.

136.    In addition to conspiring with Defendants to defraud SECU into making the loan for their own personal benefit, Ms. Ossareh breached and is in default of the Ossareh Loan Agreement. Ms. Ossareh did not use the loan proceeds for the stated and express purpose of purchasing the Ossareh Vehicle as promised but rather participated in a fraudulent scheme that resulted in the proceeds of her loan being paid to Ultimate Auto without Ultimate Auto selling the Ossareh Vehicle to Ms. Ossareh and without SECU receiving and obtaining a first lien position in the Ossareh Vehicle as required by the Ms. Ossareh Loan Agreement. Ms. Ossareh also misrepresented that she had good title to the Ossareh Vehicle, free of all security interests, when in actuality she knew he did not have any interest, much less, marketable title in the vehicle and therefore was not able to pledge Ossareh Vehicle as collateral for the loan or grant SECU a security interest in the Ossareh Vehicle as was required to secure payment of the loan.

137.    In an effort to conceal their fraud, Defendants made certain payments on the Ossareh Loan Agreement. However, upon learning of the fraud and the material breaches of the

Ossareh Loan Agreement, SECU declared the loan in default and demand payment of the full outstanding balance from both Ms. Ossareh and Ultimate Auto. Despite SECU's demand, Ms. Ossareh and Ultimate Auto have refused and otherwise failed to pay SECU for its loss.

**The RICO Act**

138.    SECU is a financial institution within the meaning of 18 U.S.C. § 1344.

139.    Each Defendant is a culpable "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c).

140.    At all relevant times, the "loan scheme enterprise" described herein, which is a non-incorporated, informal association-in-fact formed by the Defendants, operated separately and distinct form each individual Defendants.  The association-in-fact created by Defendants constitutes an "enterprise" engaged in illegal activities affecting interstate commerce pursuant to 18 U.S.C. § 1961(4) and 18 U.S.C. § 1962(a).

141.    Defendants were each associated with the enterprise and participated in its operation by participating and assisting in the fraudulent loan scheme described herein to obtain loans from SECU under false pretenses.

142.    All of the Defendants are entities or individuals capable of holding a legal or beneficial interest in property and are associated with one another through the loan scheme.

143.    As described in more detail herein, beginning in 2014, Defendants engaged in a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962, through the predicate acts of bank fraud as defined in 18 U.S.C. § 1344.  SECU was damaged as a result of this fraudulent scheme in an amount not less than $500,000.

144.    At all relevant time, in connection with the activities giving rise to this action, Defendants conspired with each other to engage in the various activities set forth herein; agreed to participate in the operation of the conspiracy and scheme to defraud SECU; and aided and abetted one another in these activities, all as proscribed by both Maryland and federal law.

145.    Beginning in December 2014 and continuing through February 2017, Defendants knowingly participated in a scheme to defraud SECU and engaged in a pattern of bank fraud in violation of 18 U.S.C. § 1344 by creating bogus purchase agreements and providing fictitious information in loan documents reflecting the purported sale of motor vehicles to fraudulently induce SECU into making loans to the Borrower Defendants to finance the purchase of motor vehicles that were never sold by the Dealer Defendants and never purchased from the Dealer Defendants by the Borrower Defendants.   Each loan made by SECU was to be secured with SECU having a perfected first lien security interest in the motor vehicle that the Borrower Defendant represented he or she was purchasing and that the Dealer Defendant represented it was selling.   But, because the underlying transactions were a sham, SECU does not have a perfected security interest in any of the used motor vehicles.

146.    Defendants' activities constitute criminal bank fraud under 18 U.S.C. § 1344.

147.    Defendants' activities constitute racketeering activities under 18 U.S.C § 1961(1).

148.    Defendants' activities constitute a pattern of racketeering activities under 18 U.S.C.        § 1961(5).

## CAUSES OF ACTION

### COUNT I
### 18 U.S.C. § 1962(a)
### (Against All Defendants)

149.    The allegations in the above stated paragraphs are incorporated by reference as if fully restated herein.

150.    Defendants have derived income from a pattern of racketeering activities.

151.    Defendants used or invested the income in the acquisition, establishment, or operation of the loan scheme.

152.    The loan scheme enterprise involved or affected interstate commerce.

153.    Defendants violated 18 U.S.C. § 1962(a).

154.    SECU has suffered injury within the meaning of 18 U.S.C. § 1964(c) by reason of the commission of the over acts described herein, constituting illegal activity in violation of 18 U.S.C.        §§ 1961(1) and 1962(a), and therefore is entitled to threefold the damages it sustained and the cost of the suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. §1964(c).

### COUNT II
### 18 U.S.C. § 1962(b)
### (Against All Defendants)

155.    The allegations in the above stated paragraphs are incorporated by reference as if fully restated herein.

156.    Defendants engaged in a pattern of racketeering activities to acquire or maintain an interest in or control of the loan scheme enterprise.

157.   The loan scheme enterprise engaged in or its activities affected interstate commerce.

158.   Defendants violated 18 U.S.C. § 1962(b).

**159.**   SECU has suffered injury within the meaning of 18 U.S.C. § 1964(c) by reason of the commission of the over acts described herein, constituting illegal activity in violation of 18 U.S.C.           §§ 1961(1) and 1962(b), and therefore is entitled to threefold the damages it sustained and the cost of the suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. §1964(c).

## COUNT III
### 18 U.S.C. § 1962(c)
### (Against All Defendants)

160.   The allegations in the above stated paragraphs are incorporated by reference as if fully restated herein.

161.   Defendants were associated with the loan scheme enterprise to conduct or to participate in the conduct of the enterprise's affairs through a pattern of racketeering activities.

162.   The loan scheme enterprise engaged in or its activities affected interstate commerce

163.   Defendants violated 18 U.S.C. §1962(c).

164.   SECU has suffered injury within the meaning of 18 U.S.C. § 1964(c) by reason of the commission of the over acts described herein, constituting illegal activity in violation of 18 U.S.C.           §§ 1961(1) and 1962(c), and therefore is entitled to threefold the damages it sustained and the cost of the suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. §1964(c).

## COUNT IV
### 18 U.S.C. § 1962(d)
### (Against All Defendants)

165.   The allegations in the above stated paragraphs are incorporated by reference as if fully restated herein.

166.   Defendants as co-conspirators were associated with the enterprise described herein and conspired within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(a)-(c).

167.   Defendants each knew of the RICO violations of the enterprise described herein and agreed to facilitate and participate in those activities.

168.   Defendants violated 18 U.S.C. §1962(d).

169.   SECU has suffered injury within the meaning of 18 U.S.C. § 1964(c) by reason of the commission of the over acts described herein, constituting illegal activity in violation of 18 U.S.C.        §§ 1961(1) and 1962(d), and therefore is entitled to threefold the damages it sustained and the cost of the suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. §1964(c).

## COUNT V
### Fraud
### (Against All Defendants)

170.   The allegations in the above stated paragraphs are incorporated by reference as if fully restated herein.

171.   The Dealer Defendants with the assistance of Omid Ilkhan, Amir Halataei, Mehran Halataei, and Jodi Cowley Mahdavi created, completed and/or signed the bogus purchase agreements and the completed loan checks described herein with the intent that the

Borrower Defendants would provide those sham agreements to SECU and/or that the completed loan checks would be received by SECU and that SECU would rely on those documents to extend credit to the Borrower Defendants.

172. The Borrower Defendants and the Dealer Defendants signed the bogus purchase agreements and/or loan checks described herein and provided the bogus purchase agreements and loan documents to SECU with the intent that SECU would rely on those documents to extend credit.

173. The Dealer Defendants, the Borrower Defendants and Omid Ilkhan, Amir Halataei, Mehran Halataei, and Jodi Cowley Mahdavi knew that the purchase agreements and completed loan checks provided to SECU were bogus and that the purchase transactions reflected in the agreements and/or the face of the complete loan checks were a sham.  The Dealer Defendants did not intend to and did not sell the used motor vehicles identified in the purchase agreements and/or loan documents and the Borrower Defendants did not intend to purchase and did not purchase the used motor vehicles identified in the purchase agreements and/or loan documents.

174. SECU justifiably relied on the purchase agreements and the information provided in the loan documents in approving the loans made to the Borrower Defendants. These loans were conditioned on the Borrower Defendant purchasing the identified used motor vehicle and pledging that vehicle as collateral to secure payment of the loan, and SECU receiving a perfected, first lien security interest in the "financed" vehicle.  But, because the underlying purchase transactions were a sham, the Borrower Defendants never obtained title to the vehicles and SECU never received a perfected security interest in any of the vehicles that the

Borrower Defendants were obligated to, but were unable to, pledge as collateral as a result of the fraud.

175.   SECU would not have made any of the loans to the Borrower Defendants but for the fraudulent representations by Defendants.

176.   This fraud has caused SECU to sustain damages.

**COUNT VI**
**Unjust Enrichment**
**(Against the Dealer Defendants)**

177.   The allegations in the above stated paragraphs are incorporated by reference as if fully restated herein.

178.   The Dealer Defendants received the benefits of hundreds of thousands of dollars of loan proceeds for which they provided no consideration.

179.   Allowing the Dealer Defendants to keep the benefits of their fraudulent actions would unfairly confer a benefit on the Dealer Defendants to the detriment of SECU.

180.   Accordingly, the Dealer Defendants should be required to make restitution to SECU.

**COUNT VII**
**Breach of Contract**
**(Against Defendant Anna L. Cowley)**

181.   The allegations in the above stated paragraphs are incorporated by reference as if fully restated herein.

182.   Ms. Cowley entered into three separate loan agreements with SECU defined herein as Cowley Loan Agreement 1, Cowley Loan Agreement 2, and Cowley Loan Agreement 3.

183. Ms. Cowley is in default of all three loan agreements because (a) she did not use the money loaned by SECU for the purpose stated in her loan applications; (b) she made false and misleading statements in her credit application; and (c) is in default of the security agreement given in connection with each loan by virtue of the fact that Ms. Cowley did not have good title, much less any title, to the collateral pledged to secure payment of the loan.

184. As a result of Ms. Cowley's defaults, SECU has declared Cowley Loan Agreements 1, 2, and 3 immediately due and has demanded payment of the full outstanding balances in the aggregate amount of $130,620.96, plus contractual interest.

185. Despite SECU's demand, Ms. Cowley has refused and otherwise failed to pay SECU for the full outstanding balances owed on Cowley Loan Agreements 1, 2, and 3 and therefore, is in breach of agreements.

**COUNT VIII**
**Breach of Contract**
**(Against Defendant Mitzi Cowley Davis)**

186. The allegations in the above stated paragraphs are incorporated by reference as if fully restated herein.

187. Ms. Cowley Davis entered into the Davis Loan Agreement with SECU.

188. Ms. Cowley Davis is in default of the Davis Loan Agreement because (a) she did not use the money loaned by SECU for the purpose stated in her loan applications; (b) she made false and misleading statements in her credit application; and (c) is in default of the security agreement given in connection with each loan by virtue of the fact that Ms. Cowley Davis did not have good title, much less any title, to the collateral pledged to secure payment of the loan.

189.    Upon default, SECU is entitled to declare the loans immediately due and payable and Ms. Cowley is contractually obligated to immediately pay to SECU the total unpaid balances as well as accrued interest to date, any late charges and costs of collection, including reasonable attorney's fees.

190.    As a result of Ms. Cowley Davis's default, SECU has declared the Davis Loan Agreement immediately due and has demanded payment of the full outstanding balance in the amount of $51,274.68, plus contractual interest.

191.    Despite SECU's demand, Ms. Cowley Davis has refused and otherwise failed to pay SECU for the full outstanding balance owed on the Davis Loan Agreement and therefore, is in breach of agreement.

**COUNT IX**
**Breach of Contract**
**(Against Defendant Mohammad Eram)**

192.    The allegations in the above stated paragraphs are incorporated by reference as if fully restated herein.

193.    Mr. Eram entered into two separate loan agreements with SECU defined herein as Eram Loan Agreement 1 and Eram Loan Agreement 2.

194.    Mr. Eram is in default of both loan agreements because (a) he did not use the money loaned by SECU for the purpose stated in her loan applications; (b) he made false and misleading statements in her credit application; and (c) is in default of the security agreement given in connection with each loan by virtue of the fact that Mr. Eram did not have good title, much less any title, to the collateral pledged to secure payment of the loan.

195.   Upon default, SECU is entitled to declare the loans immediately due and payable and Mr. Eram is contractually obligated to immediately pay to SECU the total unpaid balances as well as accrued interest to date, any late charges and costs of collection, including reasonable attorney's fees.

196.   As a result of Mr. Eram defaults, SECU has declared Eram Loan Agreements 1 and 2immediately due and has demanded payment of the full outstanding balances in the aggregate amount of $96,806.44, plus contractual interest.

197.   Despite SECU's demand, Mr. Eram has refused and otherwise failed to pay SECU for the full outstanding balances owed on Eram Loan Agreements 1 and 2 and therefore, is in breach of agreements.

**COUNT X**
**Breach of Contract**
**(Against Defendant Diana Kneipp)**

198.   The allegations in the above stated paragraphs are incorporated by reference as if fully restated herein.

199.   Ms. Kneipp entered into two separate loan agreements with SECU defined herein as Kneipp Loan Agreement 1 and Kneipp Loan Agreement 2.

200.   Ms. Kneipp is in default of both loan agreements because (a) she did not use the money loaned by SECU for the purpose stated in her loan applications; (b) she made false and misleading statements in her credit application; and (c) is in default of the security agreement given in connection with each loan by virtue of the fact that Ms. Kneipp did not have good title, much less any title, to the collateral pledged to secure payment of the loan.

201. Upon default, SECU is entitled to declare the loans immediately due and payable and Ms. Kneipp is contractually obligated to immediately pay to SECU the total unpaid balances as well as accrued interest to date, any late charges and costs of collection, including reasonable attorney's fees.

202. As a result of Ms. Kneipp's defaults, SECU has declared Kneipp Loan Agreements 1 and 2 immediately due and has demanded payment of the full outstanding balances in the aggregate amount of $46,251.80, plus contractual interest.

203. Despite SECU's demand, Ms. Kneipp has refused and otherwise failed to pay SECU for the full outstanding balances owed on Kneipp Loan Agreements 1 and 2 and therefore, is in breach of agreements.

**COUNT XI**
**Breach of Contract**
**(Against Defendant Mehdi Goudarzi)**

204. The allegations in the above stated paragraphs are incorporated by reference as if fully restated herein.

205. Mr. Goudarzi entered into the Goudarzi Loan Agreement.

206. Mr. Goudarzi is in default of the loan agreement because (a) he did not use the money loaned by SECU for the purpose stated in her loan applications; (b) he made false and misleading statements in her credit application; and (c) is in default of the security agreement given in connection with each loan by virtue of the fact that Mr. Goudarzi did not have good title, much less any title, to the collateral pledged to secure payment of the loan.

207. Upon default, SECU is entitled to declare the loans immediately due and payable and Mr. Goudarzi is contractually obligated to immediately pay to SECU the total

53

unpaid balances as well as accrued interest to date, any late charges and costs of collection, including reasonable attorney's fees.

208.   As a result of Mr. Goudarzi's default, SECU has declared the Goudarzi Loan Agreement immediately due and has demanded payment of the full outstanding balance in the aggregate amount of $11,074.82, plus contractual interest.

209.   Despite SECU's demand, Mr. Goudarzi has refused and otherwise failed to pay SECU for the full outstanding balance owed on the Goudarzi Loan Agreement and therefore, is in breach of agreement.

**COUNT XII**
**Breach of Contract**
**(Against Defendant Abdolreza Ossareh)**

210.   The allegations in the above stated paragraphs are incorporated by reference as if fully restated herein.

211.   Ms. Ossareh entered into the Ossareh Loan Agreement with SECU.

212.   Ms. Ossareh is in default of the Ossareh Loan Agreement because (a) she did not use the money loaned by SECU for the purpose stated in her loan applications; (b) she made false and misleading statements in her credit application; and (c) is in default of the security agreement given in connection with each loan by virtue of the fact that Ms. Ossareh did not have good title, much less any title, to the collateral pledged to secure payment of the loan.

213.   Upon default, SECU is entitled to declare the loans immediately due and payable and Ms. Ossareh is contractually obligated to immediately pay to SECU the total

unpaid balances as well as accrued interest to date, any late charges and costs of collection, including reasonable attorney's fees.

214. As a result of Ms. Ossareh's default, SECU has declared the Ossareh Loan Agreement immediately due and has demanded payment of the full outstanding balance in the amount of $19,048.37, plus contractual interest.

215. Despite SECU's demand, Ms. Ossareh has refused and otherwise failed to pay SECU for the full outstanding balance owed on the Davis Loan Agreement and therefore, is in breach of agreement.

### SUMMARY OF CLAIMS

**WHEREFORE,** SECU requests the Court to award the following relief as follows:

A. As to Counts I through IV (under RICO for bank fraud), judgment against all Defendants for treble damages and legal fees and expenses as part of the damages;

B. As to Count V (fraud), judgment against all Defendants for damages in excess of $500,000 and legal fees and expenses as part of the damages;

C. As to Count VI (unjust enrichment against the Dealer Defendants), judgment against Defendants BOCA Investments, LLC t/a Priceless of Odenton; Auto Select Inc. t/a Ultimate Auto, and NEA, Inc., jointly and severally, in an amount not less than $500,000 and legal fees and expenses as part of the damages;

D. As to Count VII (breach of contract), judgment against Defendant Anna L. Cowley in the amount of amount of $130,620.96 as well as accrued interest to date, any late charges and costs of collection, including reasonable attorney's fees;

100 Light Street
Baltimore, Maryland 21202
(410) 727-6464
blmoffet@milesstockbridge.com
mbbrown@milesstockbridge.com

*Attorneys for Plaintiff*
*State Employees Credit Union of Maryland, Inc.*

4818-4848-0592, v. 4

E. As to Count VIII (breach of contract), judgment against Defendant Mitzi Cowley Davis in the amount of amount of $51,274.68 as well as accrued interest to date, any late charges and costs of collection, including reasonable attorney's fees;

F. As to Count IX (breach of contract), judgment against Defendant Mohammad Eram in the amount of amount of $96,806.44 as well as accrued interest to date, any late charges and costs of collection, including reasonable attorney's fees;

G. As to Count X (breach of contract), judgment against Defendant Diana Kneipp in the amount of amount of $46,251.80 as well as accrued interest to date, any late charges and costs of collection, including reasonable attorney's fees;

H. As to Count XI (breach of contract), judgment against Defendant Mehdi Goudarzi in the amount of amount of $11,074.82 as well as accrued interest to date, any late charges and costs of collection, including reasonable attorney's fees;

I. As to Count XII (breach of contract), judgment against Defendant Abdolreza Ossareh in the amount of amount of $19,048.37 as well as accrued interest to date, any late charges and costs of collection, including reasonable attorney's fees; and

J. Any further relief the Court deems proper.

Respectfully submitted,

Brian L. Moffet (Fed. Bar No. 13821)

Michael B. Brown (Fed. Bar No. 19641)
MILES & STOCKBRIDGE, P.C.

56